IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

L. QIY AM POGUE,

      Plaintiff,               No. CIV S-05-1873 MCE GGH P

   vs.

JEANNE WOODFORD, et al.,       ORDER and FINDINGS AND

      Defendants.         RECOMMENDATIONS

_____/

*Introduction and Summary*

      On account of prison transfers and vague claims, plaintiffs' pleadings in this religion-in-prison case are dysfunctional giving rise to numerous questions as to the proper parties and claims and exhaustion status.  However, given liberal pro se pleading standards as they are, district courts are compelled to divine what is at issue.  A good part of the Findings and Recommendations will be spent in setting forth the history of this case and the appropriate issues as the undersigned has seen and presently sees them.

      Plaintiff has filed suit essentially claiming that his abilities to practice his Muslim religion were unduly burdened at his former institution (Sierra Conservation Center), and have been unduly infringed at Pleasant Valley State Prison, his present incarceration locale.  The motions and oppositions in this matter at bar total approximately 1,000 pages.  In those pages,

1  defendants seek to have two of plaintiff's purported six claims dismissed on the basis that they

2  were not administratively exhausted prior to filing suit, and on the merits of all six claims.

3          For the reasons that follow defendants' exhaustion ground should be denied.

4  However, but for the halal/kosher diet claim, defendants should be awarded summary judgment

5  on all other claims.  Even for the diet claim, defendants in their individual capacity are qualifedly

6  immune from damages.  This case should go to trial on the diet claims for prospective relief only.

7  *Pertinent Case Chronology*

8          On September 10, 2005, plaintiff filed his complaint while housed at Sierra

9  Conservation Center.  The complaint named Jeanne Woodford, then the Director of CDCR and

10  also "all unknown wardens of all CDC prisons."  "Class Action" was denominated on this

11  pleading.  The complaint raised four issues:

12  1.  Be allowed to participate in Jumu'ah without penalty[1];

13  2.  That CDCR hire paid imams for religious services involving Muslim prisoners;

14  3.  That Muslim prisoners be allowed to have beards and long hair;

15  4.  That Muslim prisoners be given halal/kosher diets.

16  The complaint sought injunctive relief and $10,000 in total damages.

17          Director Woodford was ordered served on January 13, 2006; Director Tilton was

18  substituted in with respect to his official capacity on September 8, 2006.  The court also sought,

19  in vain, to acquire counsel for plaintiff.  In his September 8th order, the undersigned found that

20  no class action motion had been filed, that class actions litigated by pro se plaintiffs were nearly

21  impossible with a layperson acting as both the class representative and class counsel, and that the

22  action would be "presently construed" as a non-class action.[2]  Plaintiff was ordered to amend the

23  ───────────────

24  [1]Plaintiff spells "Jumu'ah" without the apostrophe; nevertheless, the court will use the
more common spelling.

25  [2]The conclusion section of that order erroneously stated that plaintiff's motion for a class
action was denied.  First, no bona fide motion had been filed.  Second, the undersigned does not
26  have the authority in a non-consent case to deny class action status.  The correct status of this

1  complaint for various reasons.  The First Amended Complaint was filed, but now plaintiff had

2  several other prisoners join in as plaintiffs.  For the reasons set forth in the court's April 30, 2007

3  order, the multi-plaintiff action was severed, plaintiff was ordered to proceed on his own, and file

4  a Second Amended Complaint.

5          The Second Amended Complaint was filed essentially reiterating the issues in the

6  initial complaint.  However, in an attached Memorandum of Points and Authorities, plaintiff

7  appeared to attempt to add two new issues:

8  5.  Being permitted to purchase and use prayer oils;

9  6.  Being permitted single cell status on account of cleanliness requirements of the Muslim

10  religion.

11          Defendants[3] brought a motion to dismiss for lack of exhaustion of administrative

12  remedies.  Although recognizing that the court had not included plaintiff's spurious add on

13  claims as referenced in the memorandum, attached to the Second Amended Complaint, see Order

14  of September 25, 2007, defendants collectively attacked all six issues.  Defendants reasoned that

15  because plaintiff had been transferred to Pleasant Valley, any exhaustion of remedies at Sierra

16  Conservation Center (SCC) could not be applicable to complaints at Pleasant Valley.  No

17  mention was made in the first motion that the last two of the six claims applied *only* to Pleasant

18  Valley.  In adjudicating defendants' first motion to dismiss for lack of exhaustion, the

19  undersigned responded to the collective attack by finding that the previous exhaustion at SCC

20  would apply to a transferred plaintiff.  Order; Findings and Recommendations of March 21,

21  2008.  This holding was adopted by the district judge.  Whether defendants can bring a second

22  motion on a theory that the last two issues required exhaustion since they only applied to the new

23

24  case is as set forth in the text of the order – as presently construed, plaintiff is proceeding on his
    own as an individual.  Plaintiff may file a motion for class certification assuming that issues
25  survive the motion for summary judgment, but he must realize that such a motion filed by a pro
    se in all probability will ultimately be denied.

26          [3]  The status of the defendants in their individual and official capacity is set forth below.

1 prison is discussed below.

2       We now arrive at the point of defendants' combined motion to dismiss and for

3 summary judgment.

4 *Motion to Strike Declarations*

5       Plaintiff seeks to strike three reply declarations (Myers, Igbinosa, Duncan) on the

6 basis that the initial declarations filed omitted the "I declare under penalty of perjury..." sentence.

7 When brought to the attention of defendants' counsel, substitute declarations were filed with the

8 inadvertently omitted sentence now in place.

9       While plaintiff is, of course, correct that unsworn declarations are not admissible

10 on summary judgment, plaintiff posits no legitimate reason why technical errors such as the one

11 at issue cannot be rectified in the absence of bona fide prejudice to plaintiff.  The motion to strike

12 is ordered denied.

13 *Exhaustion*

14       Defendants contend in this motion to dismiss for failure to exhaust that plaintiff

15 cannot rely on the court's previous holding of a "transferred exhaustion" from SCC to Pleasant

16 Valley for his 5th (prayer oils) and 6th (single cell) claims because plaintiff did not make these

17 claims at SCC, but only Pleasant Valley.  While defendants' assertion may be factually accurate,

18 defendants do not address the reasons why they did not make this assertion in the previous

19 exhaustion motion.

20       As set forth above, defendants made the previous exhaustion dismissal motion on

21 the basis that none of the claims were exhausted, administrative proceedings having been

22 commenced at SCC, but not at Pleasant Valley, prior to the bringing of the federal complaint.

23 However, they did not argue that only some of the claims were Pleasant Valley only claims.  The

24 second motion is therefore a seriatim, non-enumerated Fed. R. Civ. P 12(b) motion, i.e., based on

25 a different theory.  "'[W]hen a court decides upon a rule of law, that decision should continue to

26 govern the same issues in subsequent stages in the same case.'"  <u>United States v. Park Place</u>

Assoc., Ltd., 563 F.3d 907, 925 (9th Cir. 2009).  In this case, the court has decided that plaintiff exhausted administrative remedies.  That order is ultimately a ruling on the law, and should not be upset absent satisfactory reasons.  Here, defendants posit no reasons to be relieved of the law of the case doctrine.  Hence, the motion to dismiss claims 5 and 6 based on lack of exhaustion should be denied.

*The Merits*

A.  Standards

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district court
> of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ. P. 56(c)).

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is

1  satisfied." Id. at 323, 106 S. Ct. at 2553.

2          If the moving party meets its initial responsibility, the burden then shifts to the

3  opposing party to establish that a genuine issue as to any material fact actually does exist. See

4  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

5  (1986). In attempting to establish the existence of this factual dispute, the opposing party may

6  not rely upon the allegations or denials of its pleadings but is required to tender evidence of

7  specific facts in the form of affidavits, and/or admissible discovery material, in support of its

8  contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

9  106 S. Ct. at 1356 n. 11. The opposing party must demonstrate that the fact in contention is

10  material, i.e., a fact that might affect the outcome of the suit under the governing law, see

11  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

12  Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

13  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

14  nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

15          In the endeavor to establish the existence of a factual dispute, the opposing party

16  need not establish a material issue of fact conclusively in its favor. It is sufficient that "the

17  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

18  versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary

19  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

20  genuine need for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

21  56(e) advisory committee's note on 1963 amendments).

22          In resolving the summary judgment motion, the court examines the pleadings,

23  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

24  any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson,

25  477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the

26  court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587, 106 S. Ct.

1  at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

2  obligation to produce a factual predicate from which the inference may be drawn.  See Richards

3  v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

4  (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

5  simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

6  taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

7  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

8       On February 24, 2006, the court advised plaintiff of the requirements for opposing

9  a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154

10  F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir.

11  1988).

12       B.  Types of Claims; Status of Defendants

13       Plaintiff's present claims against defendants located at SCC can only be

14  predicated on a claim for damages as plaintiff is no longer housed in that institution.  However,

15  claims against officials at Pleasant Valley can sound in both damages and injunctive relief,

16  assuming that the claims are otherwise appropriate against the named defendants.  The problem

17  here is that plaintiff was not very careful in identifying the defendants he desired to sue, and with

18  the exception of Warden Yates, defendants have made no attempt to separate the defendants'

19  activities insofar as they may relate to SCC or Pleasant Valley.

20       As related above, the operative complaint is the second amended complaint.

21  Plaintiff sued therein the California Department of Corrections, which cannot be sued under the

22  Eleventh Amendment (see Findings and Recommendations of 9/26/07), Secretaries Woodford,

23  Hickman and Tilton.  Plaintiff also sued all unknown wardens of every CDCR institution.  For

24  obvious reasons, none of these anonymous wardens were served.[4]  The court did substitute in the

25

26       [4]  Plaintiff had sued these wardens just in case he was ever sent to another institution.

7

warden at plaintiff's present institution, Pleasant Valley-defendant Yates.  An answer was filed on behalf of these defendants. (Answer, June 5, 2008).

Plaintiff purported to sue all defendants in their individual and official capacities. As CDCR has undergone quite a bit of leadership change in the past several years, none of the above Secretaries currently hold the position of Secretary, CDCR, and can have no official capacity.  Matthew Cate is the present Secretary of CDCR and he will be substituted in this case *in his official capacity only*.  See Fed. R.Civ.P. 25(d).  Plaintiff has never sought leave to identify individuals at his former SCC facility as defendants in this action.

Defendants have made no assertion, and do not assert here, that the remaining defendants are somehow not individually linked to plaintiff's allegations at either SCC or Pleasant Valley for purposes of individual liability.  Thus, the status of defendants is as follows:

1. Cate: official capacity only;

2. Woodford: individual capacity only;

3. Tilton; individual capacity only;

4. Hickman: individual capacity only;

5. Yates: individual and official capacity (but only for Pleasant Valley).[5]

C. Plaintiff's Failure to Organize Disputed Facts

In making their motion for summary judgment, defendants correctly, and pursuant to the rules of this court, set forth a separate statement of undisputed facts.  Eastern District Local Rule 56-260.  Plaintiff is supposed to counter this with a fact-by-fact agreement, agreement in part and/or a showing by reference of where the court might find a disputed fact.  The reasons for the court rules are obvious – the adjudicator should be able to look in one place to see if a party is disputing a fact set forth by the moving party as undisputed.  In an action such as this which presents multiple issues of an important nature, the need for organization of facts is even more

---

[5] Thus, the only "individual capacity" defendants are former Directors of CDCR. Defendants do not bring their motions, however, on a linking basis.

1   critical.

2          Plaintiff did not follow the rules of this court.  Rather, he filed a memorandum of

3   points and authorities with hundreds of pages (mostly unreferenced) of exhibits attached thereto

4   setting forth unauthenticated, for the most part, explications of the religion of Islam related to

5   primarily diet issues.  Two declarations, which are not referenced in any significant manner in the

6   points and authorities, have been separately filed.  The points and authorities themselves,

7   although containing bits and pieces of valid argument, are rather stream of consciousness and flip

8   back and forth between the issues.  To complicate matters, plaintiff then decides to file various

9   add-ons after the pleadings have closed for the summary judgment motion.

10          The point of this section is not to criticize plaintiff for the sake of criticizing.

11  Indeed, the undersigned recognized the difficulties inherent in this case when it attempted to find

12  counsel.  But, the rules are in place for a purpose, and it is not feasible for the undersigned to

13  start a document by document review of everything filed in the case by plaintiff for relevance and

14  admissibility with respect to each issue.

15          The present opposition brings into focus the Ninth Circuit's conflicting rulings on

16  analysis of pro se oppositions to summary judgments.  The Ninth Circuit has stated that pro se

17  litigants must follow the same rules of procedure that govern other litigants.  King v. Atiyeh, 814

18  F.2d 565, 567 (9th Cir.1987).  As a general rule for ordinary litigants, the judge does not have to

19  scour the record in efforts to find evidence which might defeat summary judgment, i.e., the

20  litigant must supply the needed evidence *within the motion or opposition*.  See Carmen v. San

21  Francisco Unified School Dist., 237 F.3d 1026, 1030 (9th Cir. 2001) (stating the rule for

22  represented parties: "Other circuits are not unanimous, but *Forsberg* is both binding on us and

23  consistent with the majority view that the district court may limit its review to the documents

24  submitted for the purposes of summary judgment and those parts of the record specifically

25  referenced therein."); but see Jones v. Blanas, 393 F.3d 918, 922-923 (9th Cir. 2004) ("[b]ecause

26  Jones is pro se, we must consider as evidence in his opposition to summary judgment all of Jones

1   [admissible] contentions offered in motions and pleadings [signed under penalty of perjury].")  It

2   is difficult to square Jones with King because Jones clearly fashions a separate rule for pro se

3   litigants in opposing summary judgment, and does away with the "same rules of procedure that

4   govern other litigants."

5          Moreover,

6          A trial court can only consider admissible evidence in ruling on a
           motion for summary judgment. See Fed.R.Civ.P. 56(e); *Beyene v.*
7          *Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).
           Authentication is a "condition precedent to admissibility," FN6 and
8          this condition is satisfied by "evidence sufficient to support a
           finding that the matter in question is what its proponent claims."
9          FN7 Fed.R.Evid. 901(a). We have repeatedly held that
           unauthenticated documents cannot be considered in a motion for
10         summary judgment.  *See Cristobal v. Siegel*, 26 F.3d 1488, 1494
           (9th Cir.1994); *Hal Roach Studios, Inc. v. Richard Feiner & Co.,*
11         *Inc.*, 896 F.2d 1542, 1550-51 (9th Cir.1989); *Beyene*, 854 F.2d at
           1182; *Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th
12         Cir.1987); *Hamilton v. Keystone Tankship Corp.*, 539 F.2d 684,
           686(9th Cir.1976).

13

14   Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir.2002) (footnotes omitted).  But see Fraser v.

15   Goodale, 342 F.3d 1032, 1036 (9th Cir.2003) (form of evidence is unimportant; only the

16   substance matters, and as long as the substantive evidence "could" be made use of at trial, it does

17   not have to be admissible per se at summary judgment.  The Ninth Circuit also permits sworn to

18   allegations of the complaint, Schroeder v. McDonald, 55 F.3d, 454, 460 (9th Cir. 1995), and

19   seemingly almost any attachment thereto to be used to oppose the summary judgment because

20   the substance, unless privileged, "could" conceivably be made admissible at trial if sufficient

21   witnesses were called.

22          If the national rules of civil procedure and the local rules of this court do not apply

23   to pro se litigants, and if King v. Atiyeh, supra, is not good law, a clear statement to that effect

24   should be made.  Until such time, the undersigned is in a quandary about which line of authority

25   to follow.  Doing the best he can at this juncture, the undersigned will:

26   1.  not review post-reply add on arguments and exhibits;

1   2.  review any attachments to the opposition to summary judgment and declarations filed

2   therewith;

3   3.  review those materials outside the summary judgment process, and filed before that process

4   began, if they were at least referenced by plaintiff anywhere in his summary judgment

5   opposition;

6   4.  assume everything plaintiff files in the way of declarations and exhibits "could" be made

7   admissible at trial.

8        D.  RLUIPA

9            The undersigned commences discussion with the observation that the Religious

10  Land Use and Institutionalized Persons Act (RLUIPA) imposes more stringent limitations than

11  the Constitution's Free Exercise part of the First Amendment on the day-to-day running of a

12  prison vis-a-vis religious practice of the inmates.  Warsoldier v. Woodford, 418 F.3d 989, 997-

13  998 (9th Cir. 2005).  Thus, the undersigned will analyze the statutory claim first.

14           Because the case of Shakur v. Schriro, 514 F.3d 878 (9th Cir. 2008), describes

15  most of the RLUIPA principles applicable to this lawsuit, the undersigned quotes generously

16  from the case without internal citations.  "Section 3 of RLUIPA provides that '[n]o government

17  shall impose a substantial burden on the religious exercise of a person residing in or confined to

18  an institution ... even if the burden results from a rule of general applicability,' unless the

19  government demonstrates that the burden is "in furtherance of a compelling government interest"

20  and is "the least restrictive means of furthering that ... interest.' RLUIPA § 3(a), 42 U.S.C. §

21  2000cc-1(a)."  Id. at 888.  "RLUIPA defines 'religious exercise' as 'any exercise of religion,

22  whether or not compelled by, or central to, a system of religious belief.' § 2000cc-5(7)(A). We

23  have noted that a burden is substantial under RLUIPA when the state " 'denies [an important

24  benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on

25  an adherent to modify his behavior and to violate his beliefs.' " Id. Proving that a prison

26  institution has a "compelling" interest cannot be found on conclusory affidavits, and a prison

"cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." Id. at 890.  Applicable to all prison/religion cases, "'[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'" Id. at 884.

### 1. *Participation in Jumu'ah Without Penalty*

Defendants do not contest the legal assertion that plaintiff should be permitted to attend Friday Jumu'ah services without penalty.  See Mayweathers v. Newland, 328 F. Supp. 2d 1086, 1096-97 (E.D. Cal. 2004).  Rather, the dispute here, if any, is whether in fact plaintiff is permitted to attend Jumu'ah services without penalty.

There appears to be no question that plaintiff currently is permitted to attend Jumu'ah services as the essential right to attend such services is not even at issue in the Second Amended Complaint.  There also appears to be no question that plaintiff suffers no harm himself from such attendance.  Other than the barest assertion in the Second Amended Complaint that he has been penalized (in some unknown fashion) for his participation at Jumu'ah, plaintiff presents no punishment facts.  Defendants cited to those portions of plaintiff's deposition where plaintiff conceded that he himself had not been harmed in setting forth the following undisputed facts.

> 48.  Jumu'ah services are generally held in CDCR prisons, with the exception of the occasional security concern that may prevent Jumu'ah services.
> 49.  Inmates committed to an indefinite term as a third strike offender are not entitled to earn any credit to reduce their minimum term.
> 50. Pogue is unassigned, without a job, and could not have been penalized for attending Jumu'ah services through the loss of work custody credits.

Because of plaintiff's inability to earn credits for sentence reduction, and the lack of any other affirmative punishment, it does not appear that plaintiff could be harmed. [6]  In opposing summary

---

[6]  Plaintiff's deposition is attached to the Duncan declaration; it will be referenced by "RT."

1  judgment, plaintiff posits no fact of punishment; in fact, the court cannot locate where plaintiff

2  speaks about this issue at all.  Summary judgment should be granted to defendants on this claim.[7]

3         2. *Failure of SCC to Hire an Imam*

4        In his deposition, plaintiff testified to his access to the imam at Pleasant Valley,

5  and it was substantial.  RT 32-35; 86-88.  Thus, plaintiff's claim of a lack of access to an imam

6  is related to SCC, and that only for money damages.[8]  Defendants concede that no salaried imam

7  is present at SCC for budgetary reasons.  Chavez Declaration.  However, some other "major"

8  religions have paid chaplains at SCC.  The relatively small number of Muslims at SCC is the

9  reason why no paid imam is retained there.  Chavez Declaration.

10        There are no material disputed facts over the lack of an Imam at SCC.  The

11  questions are whether RLUIPA requires such an appointment and, if so, whether lack of

12  designated budgetary resources stands as a compelling reason for the non-appointment.  The

13  matter of whether plaintiff can seek monetary relief for an alleged RLUIPA violation, the only

14  possible relief here in that plaintiff is no longer housed at SCC, need not be determined in this

15  section.

16        RLUIPA is phrased in a way which prevents prison officials from substantially

17  burdening the practice of religion; its text does not require the performance of affirmative acts,

18  especially budget expenditures, in order to facilitate an inmate's religious practice.  Thus, it is not

19  surprising that many courts have determined that prisons do not have to hire clergy or imams to

20  minister to inmates.

21            Not "every religious sect or group within a prison-however few in

22            number-must have identical facilities or personnel ... nor must a

---

23      [7] Indeed, from the excerpts of plaintiff's deposition, it appears that plaintiff was raising
  this claim on behalf of others, and not himself.

24

25      [8] In post-opposition filings, plaintiff discusses the fact that the previous imam has left,
  and Pleasant Valley is in the recruitment process for a new Imam.  Although it is proving
  difficult to find a ready, willing and able imam, this temporary situation is not related to the

26  claims of the complaint.  The prison cannot force a paid imam to be present on the premises.

1

2

3

4

5

6

7

> chaplain, priest, or minister be provided without regard to the extent of the demand." Allen v. Toombs, 827 F.2d 563, 568 (9th Cir.1987). The Court notes that Defendants' evidence makes clear that Plaintiff may have access to a spiritual adviser, but that Plaintiff is responsible for co-ordinating such a visit. (Def's Ex. 7, Linderman Decl.FN3 at 19 .) Plaintiff has not alleged that he has been denied access to a spiritual adviser, only that one has not been provided for him. Plaintiff has not demonstrated that his ability to practice his religion is substantially burdened by the requirement that he bear the responsibility for co-ordinating his visits with a spiritual adviser, and the Court finds no RLUIPA violation in the ADOC's policy.

8 Jones v. Schiro, 2006 WL 2772641 (D. Ariz. 2006) *4.

9 See also, Abdulhaseeb v. Culhane, 2008 WL 904661 (W.D. Ok. 2008); Tyson v. Guisto, 2008

10 WL 2673371 (D. Or. 2008).  See generally the First Amendment cases of  Blair-Bey v. Nix, 963

11 F.2d 162 (8th Cir. 1992); Reimers v. State of Oregon, 863 F.2d 630 (9th Cir. 1988).

12          If the rule were to the contrary, prisons would also have to fund any other religion

13 facilitating request without which an inmate could claim a substantial burden: the construction of

14 individual religious places of worship, the purchase of religious articles to be used in ceremonies,

15 religious garments, religious publications and the like – all for the purpose of aiding an inmate in

16 his practice of religion.  These items may be of great importance to one in religious practice, but

17 there is a distinct line to be drawn between providing a service of general applicability, e.g., food,

18 such that it does not burden the practice of religion, and requiring affirmative acts of prison

19 officials to provide services or items having no basis in the essentials of prison life.  Moreover,

20 there is similarly a distinction in requiring prison officials to construct a work schedule to permit

21 attendance at religious ceremonies absent a compelling countervailing interest, and requiring the

22 prison to satisfy all of one's religious requests regardless of their non-availability within prison

23 grounds.[9]

24 \\\\\

25

26          [9]  This is not to say that prison officials may provide services to one religion, but discriminate against another.  However, this case contains no such discriminatory animus claims.

14

1    The undersigned is aware of a decision in this district, <u>Rouser v. White</u>, __F.Supp.

2    2d __, 2009 WL 1393215 (E.D. Cal. May 15, 2009), in which Judge Karlton declined to enter

3    summary judgment for defendants on a claim, *inter alia*, that the prison had failed to hire Wiccan

4    ministers.  The undersigned finds this decision inapplicable for two reasons.  First, to the extent

5    that the <u>Rouser</u> court found a Constitutional or RLUIPA requirement for prisons to provide such

6    facilitative acts, not based within the essentials provided in a prison context, the undersigned

7    respectfully disagrees for the reasons set forth above.  Secondly, Judge Karlton found that

8    defendants in <u>Rouser</u> had not demonstrated with sufficient particularity the budgetary concerns

9    which allegedly animated their decision not to hire a Wiccan minister.  In this case, plaintiff in no

10   way challenges the budgetary assertions of defendants.

11          Summary judgment should be awarded to the SCC defendants on this claim.

12          3. *Beards and Long Hair*

13          There is no dispute that CDCR policies regarding grooming have changed since

14   January 2006, permitting inmates to have reasonably lengthy hair and beards.  15 Cal. Code

15   Regs. 3062(e),(h).  Inmates may now wear their hair at any length, not to extend over the

16   inmate's eyebrows or face, and beards of up to one-half inches are permitted.  <u>Id</u>.  Plaintiff

17   focuses on policies in the past which prohibited beards and hair longer than three inches.

18   Plaintiff was never disciplined about his grooming, but he claims that he cut his hair, and did not

19   have a beard, to avoid discipline, contrary to his religious beliefs.  Plaintiff admitted in his

20   deposition that the current regulations are satisfactory.  RT 111.

21          Because the changed, current regulations cannot be reasonably challenged as

22   infringing on plaintiff's religious practice/beliefs, plaintiff may not receive any prospective relief.

23   42 U.S.C. § 2000cc-3 (e) (safe harbor provision).[10]

----

24          [10] "A government may avoid the preemptive force of any provision of this chapter by
25   changing the policy or practice that results in a substantial burden on religious exercise, by
     retaining the policy or practice and exempting the substantially burdened religious exercise, by
26   providing exemptions from the policy or practice for applications that substantially burden

1        As plaintiff observes, there is a serious question concerning whether monetary

2   damages are awardable under RLUIPA.  The weight of circuit authority, which the undersigned

3   chooses to follow, does not permit damages against a state entity or persons in their official

4   capacity as Congress did not expressly waive a state's sovereign immunity as to damages.  See

5   Rendelman v. Rouse, 569 F.3d 182, 187 (4th Cir. 2009) citing Madison v. Virginia, 474 F.3d 118

6   (4th Cir. 2006); Cardinal v. Metrish, 564 F.3d 794, 800-801 (6th Cir. 2009); Sossaman v. Lone

7   Star State, 560 F.3d 316, 330-332 (5th Cir. 2009); but see Smith v. Allen, 502 F.3d 1255 (11th

8   Cir. 2007) (allowing nominal damages).

9        Again, the weight of circuit authority holds that Congress cannot render

10  individuals in their individual capacity liable when Congress enacts a statute such as RUILPA

11  pursuant to the Spending Clause.  *All* of the above cited cases agree.

12       Because plaintiff can secure no relief on his claim of past compliance with

13  repealed grooming regulations, summary judgment should be awarded against this claim under

14  RLUIPA.

15       4.  *Halal and Kosher Diets*

16       Plaintiff invests most of his time opposing defendants' motion for summary

17  judgment on this issue.  Defendants have supplied the court two declarations containing the

18  following pertinent facts.

19       Matthew B. Hamidullah is a practicing Muslim, an imam, and also a former

20  warden in the federal correctional system.  He has experience in the practice of the Muslim

21  religion in the prison context.  He states that Muslims may only eat meat slaughtered in a

22  particular way; if so slaughtered, the meat is characterized a halal meat.  Muslims may eat

23  seafood and a wide variety of fruits, grains and vegetables.  The Muslim faith may prohibit the

24  eating of some foods, e.g. "unclean meat," but the religion does not mandate the eating of any

25  _____

26  religious exercise, or by any other means that eliminates the substantial burden."

particular foods.  "Many Muslims" believe that eating a Kosher diet is acceptable with Muslim practices.

Susan Summersett was the former CDCR food administrator, and she held that position from 2001-2008.  She is an expert dietician.  In her position, she was responsible for implementing the kosher diet served to Jewish prisoners.  She has overseen the implementation of the general religious vegetarian diet.  This diet meets the nutritional needs of male prisoners ages 31-70.  The religious vegetarian diet was designed to apply to religions which prescribe a limited diet of some sort.  Seafood is served once a week; there are no proscriptions for vegetarians who desire to have seafood.  *None* of CDCR food served contains pork or pork products.

Generally, inmates desiring the religious vegetarian diet can apply for a diet card after his practice of a certain religion is verified by a chaplain.  After being given the religious meal card, the inmate shows this card in the dining hall to obtain the religious vegetarian diet.  Jewish prisoners must obtain a verification from a rabbi that the inmate is an adherent to the Jewish religion.  Only Jewish inmates may receive the kosher diet which presumably contains kosher meat products.  The kosher diet has been implemented because of its relative minimal cost due to the low number of Jewish prisoners.

CDCR maintains these three diets (the "regular" diet, religious diet and kosher diet) because of the logistical and financial difficulties which would ensue if a multitude of different diets were to be maintained.

> 10.  All special meals create increased demands on CDCR staff.
> Should CDCR be required to serve a halal menu, extensive
> administrative, operational, budgetary, and security functions must
> be considered before its implementation. At the department level,
> staff would initially need to design a new policy and procedure,
> write new sections into the state regulations and the Department
> Operations Manual, seek approval for and allow public comment
> on these sections, research new food vendors, arrange
> transportation of food, create budgets for accessing and
> transporting new food items, build a menu that meets nutritional
> guidelines, analyze nutritional values of any halal food, and

17

purchase any additional equipment for institutions in order to cook or prepare the food items. In addition, each institution would have to properly train staff on how to prepare, cook, and sanitize food; staff and inmate workers would need to receive briefing on proper distribution of meals, custody officials must verify and learn new procedures regarding the distribution of food; chaplains must be trained; and new administrative forms printed and distributed to [ ] each prison.

11.  Currently, there are approximately 460 Jewish inmates participating in the kosher diet program at CDCR. By comparison, there are approximately 10,000 Muslim inmates in CDCR adult facilities. Should Muslim inmates want to participate in the Jewish kosher diet program, the sheer number of Muslim inmates would significantly impact the current administration of CDCR's food program. In order to provide Muslim inmates with a kosher diet, the current method of informally assembling and distributing the kosher diet within a designated kitchen area would no longer be feasible. In most institutions, the lay-out of the kitchen and the distribution method would have to be significantly re-worked to accommodate the service of kosher food to 10,0000 Muslim inmates, or alternatively, the meals would have to be prepared off-site by an outside vendor. Modifying the kitchens in each of the thirty-three institutions within CDCR to provide a kosher diet to the Muslim inmates in CDCR would require extensive planning, coordination, and cost. Furthermore, because the religious vegetarian diet program currently satisfies the dietary restrictions for Muslim inmates, a new diet program would duplicate and further complicate the prison's food administration.

12. In my former capacity as Departmental Food Administrator, I analyzed the nutritional value of CDCR menus.
a. A daily average of menus served over seven weeks shows that CDCR's religious vegetarian diet exceeds the nutritional standards for men, as set by the Food and Nutrition Board of the Institute of Medicine, National Academy of Sciences. For men ages fifty-one to seventy, the religious vegetarian diet provides 176 percent of the recommended daily protein and 280 percent of the recommended daily iron.
b. Attached as Exhibit A are true and correct copies of my nutritional analyses of CDCR's religious vegetarian diet, regular diet, and Jewish kosher diet for men ages thirty-one to fifty, and for men ages fifty-one to seventy. These analyses show that the daily averages over a seven-week period fully satisfy the nutritional requirements of adult males 31-50 and 51-70 years of age.

13. I am personally familiar with the costs of each diet program that CDCR serves. As Exhibit A shows, the costs per day per inmate are as follows: (1) the religious vegetarian diet costs $2.6268; (2) the standard pork-free diet costs $2.8066; and (3) the Jewish kosher diet costs $7.77.

18

a. There are approximately 10,000 Muslim inmates in the CDCR system. If all 10,000 Muslim inmates were to receive the religious vegetarian diet option, then this would cost $9,587,820 per year. If only 5,000 Muslim inmates were to receive the religious vegetarian diet option, then this would cost $4,793,910.

b. If all 10,000 Muslim inmates could receive the Jewish kosher diet, then this would cost $26,221,600 per year. If only 5,000 Muslim inmates could receive the Jewish kosher diet, then this would cost $13,110,800 per year.

c. Therefore the Jewish kosher diet would cost CDCR $16,633,780 more per year than the religious vegetarian diet for 10,000 Muslim inmates. For only 5,000 Muslim inmates, the Jewish kosher diet would cost CDCR $8,316,890 more per year than the religious vegetarian diet.

d. Since the CDCR food budget is approximately $165,000,000 per year, the direct cost of providing kosher meals to the Muslim inmates would increase CDCR food costs by approximately 10%, not including the cost of increased staffing and retrofitting the kitchens.

14. Despite the complications described above, CDCR is currently exploring how each of its 33 institutions can accommodate Muslim inmates with a new halal meat option. CDCR has established a Director's Work Group to explore and provide recommendations on how to provide this new halal meat option. This group is composed of food managers, Muslim chaplains, and various prison administrators who have been meeting for the past few months. The option being considered would substitute the regular meat entree at dinner with a halal meat entree. The group has prepared a memo complete with recommendations for the Secretary to consider. At this time, we anticipate the halal meat option would begin in July 2009 at the start of the next fiscal year. CDCR is developing proposed regulations for the halal meat option that should be submitted for public comment in the coming months.

15. Cost estimates for the halal meat option have not been finalized but early information suggests that it will not be as costly or as time consuming to roll out as the Jewish kosher diet. Since the halal option will simply substitute pre-cooked halal beef or chicken for the non-halal meat entrees, there will be no need to acquire additional equipment or set aside a portion of an institution's kitchen for preparation.

Summersett Declaration at 4-6.

Plaintiff vigorously opposes a vegetarian diet, but it is difficult to find the facts on which he bases his opposition. His points and authorities do not contain an organized rebuttal to the facts presented by defendants. Although plaintiff attaches several dietary exhibits, the undersigned is not equipped to read them all and make plaintiff's case for him. Nevertheless, the

undersigned has understood that plaintiff believes that a kosher diet should be given to him on an interim basis at the very least, until a halal diet is obtained.  He alleges, perhaps after reading Shakur, supra, that he suffers gastric distress with a vegetarian diet.  He observes, correctly, that defendants have not ruled out the provision of halal diets to Muslims in that the cost of such may well be less than Kosher diets.

Issues of fact remain precluding summary judgment, at least on an injunctive relief basis, see discussion above which finds damages unavailable in RUILPA actions.  The undersigned notes that declarant Summersett believed that the halal meat option could actually be in effect approximately one month ago.  Summersett was optimistic in her declaration that a halal diet could be implemented without extraordinary expense.  The undersigned is not aware of facts which would actually preclude the institution of providing such a diet.  If such a diet cannot be instituted immediately, the undersigned remains unconvinced that CDCR has compelling reasons not to give *plaintiff* a Kosher diet for a short interim period in that the diet is already in effect for Jewish inmates.  Again, this action has not been certified to be a class action at this time and involves this plaintiff only.  While there may be some ripple effect to giving plaintiff an interim Kosher diet, it is quite possible that the ripples would cease when a halal diet is finally implemented.  It is unclear in light of the facts that under RLUIPA a Muslim inmate must be forced to give up eating meat, and perhaps eggs and cheese, because a vegetarian diet is technically, sufficiently nutritious.  See Shakur v. Schiro, supra.  In addition, while defendants can argue with some force that plaintiff's vegetarian gastric problems do appear to be contrived, the undersigned is unable to rule upon such as a matter of law.

Summary judgment should be denied for this claim insofar as plaintiff seeks injunctive relief.  Again, no damages are available under RLUIPA.

5. *Prayer Oils*

Defendants posit the following facts taken from plaintiff's concessions at deposition:

Pogue admits that he has access to a variety of religious artifacts including: a prayer rug, a religious medallion, a kuffi cap, prayer beads, and a copy of the Qur'an. (Decl. Duncan2 3, Ex. B (Pl.'s Dep. 47:5-23.))

In addition, Pogue is allowed to purchase Islamic videos, cassettes, and books. (Id. 10.)

Pogue is allowed to use prayer oil on the days that Imam Salaam conducts Jumu'ah services at Pleasant Valley. *(Id.* 96:19-25.)

But Pogue claims that his religious practice is burdened by the Pleasant Valley fire marshal's requirement that prayer oil bottles be factory sealed with a Material Safety Data Sheet (MSDS) before the inmates can retain prayer oil in their cells. *(Id.* 95:11-25.)

Pleasant Valley allows inmates to purchase prayer oil, and use it during religious services. (Decl. Hudson 10, Ex. D.) But inmates are not allowed to retain the oil in their cell unless the oil complies with institutional operating procedures because the oil is a combustible material. *(Id.)*

Pogue admits that prayer oils were also retained in the chapel at SCC. (Decl. Duncan2 3, Ex. B (Pl.'s Dep. 97:4-21.))

Muslim inmates at SCC voluntarily agreed to retain their prayer oil in the chapel, whereas Muslim inmates at Pleasant Valley are required to retain prayer oil in the chapel unless the fire marshal's safety restrictions are met.  (*Id.* 95-99.)

Prayer oil is retained in the chapels at both Pleasant Valley and SCC, and  no Muslim inmates at either institution possesses prayer oil in their cells.

The court cannot find any place within plaintiff's papers where he disputes any of the above facts.  It is true, as defendants point out in their reply, that the permanent imam position at Pleasant Valley is currently vacant, and that access to prayer oils is limited to the chapel unless fire restrictions are met.  However, the court does not find these minor inconveniences to be a substantial burden on plaintiff's practice of religion.  More importantly, the fire marshal has determined that it is a safety hazard to maintain flammable oil in a cell without the appropriate seal or seal documentation.  Plaintiff is no way

\\\\\

\\\\\

1  contradicts this compelling need to keep improperly sealed oil out of his cell.[11]  Moreover,

2  the alternatives offered are the least restrictive alternatives to the compelling need not to

3  have improperly sealed and documents flammable oil outside of the prison cell.  At least,

4  plaintiff does not conceive of any.

5              Summary judgment should be granted to defendants on this RLUIPA claim.

6          6.  *Single Cell Status*

7              This claim epitomizes the excess to which RUILPA assertions can be made.

8  Petitioner would like single cell status in an overcrowded prison system because he asserts

9  his cellmate is not fastidious in his toilet practices, and petitioner needs a clean place to pray

10  when he is in his cell.  One can sense that the next RUILPA claim will require a prison to

11  maintain near total silence at times so as to not allow distractions to religious thought.  In

12  fact, plaintiff does make that claim when he asserts that cellmates won't probably respect

13  the need for silence at prayer times.  RT 114.  However, RUILPA is not a omnibus prison

14  reform act such that a prison will be more like a monastery than a prison.  Moreover, at

15  some point the necessary RLUIPA accommodation of religious practice crosses the line into

16  fostering a certain religion, even discriminating against others because of their religion, or

17  the lack of specific tenets/practices.

18              As defendants set forth, California law provides that prisoners should expect

19  to be double celled, 15 Cal. Code Regs. § 3269.  The major exception are inmates who have

20  been chronic victims of prison violence or chronic perpetrators thereof, and medically

21  impaired inmates.  Section 3269(d)(f).  The undersigned can take judicial notice that

22  _____

23      [11]  Plaintiff argues that baby oil and olive oil are permitted in cells – so why not prayer oils.  This argument does not controvert the expertise of the Fire Marshal.  Plaintiff, a layperson, in no way demonstrates that all oil is equally dangerous or flammable.  Plaintiff also alleges that

24  because of the temporary absence of an imam, he can have no access to prayer oils, presumably because he cannot access the chapel.  However, plaintiff establishes no fact that he cannot use the

25  chapel when opened for services even in the absence of an imam, nor does he contest that the prayer oil could be kept there.  Evidently, inmates at SCC, who have no access to a paid imam do

26  just fine in having their oil stored in the chapel.

1   California prisons are overcrowded.  See Coleman v. Schwarzenegger, 2009 WL 2430820

2   (E.D. Cal. 2009).  Granting single cell status to an inmate on the basis of religious needs

3   would certainly exacerbate the problem.

4               Although a case falling under the First Amendment, Richards v. White, 957

5   F.2d 471 (7th Cir. 1992), speaks to the issue here.  In that case, an inmate of the Thelemite

6   religion requested to be given a place in the prison complex where he could be alone for ½

7   hour a day, or to be given single cell status.  He claimed that his religion required this

8   privacy.  The court disposed of the request for being given a private place for a short time

9   every day, something that even plaintiff does not request, and similarly disposed of the

10  request for single cell status.

11              It is undisputed that Richards' request came at a time of
                overcrowding at the prison, which was in fact the reason
12              Richards was initially placed in a double cell. Richards'
                request for a single cell is unreasonable given the
13              unavailability of empty cells, the substantial effect the change
                would have on the particular inmate forced to give up a single
14              cell for a double cell, and resentment other prisoners in
                double cells would naturally have because of the granting of
15              such a request.

16  Id. at 474.

17              Plaintiff's claim is unreasonable in the RLUIPA context as well.  Even if not

18  being able to pray in solitude is a burden on one's religious practice, clearly, California has

19  a compelling interest in ensuring that its prisons contain all those that should be there.   If

20  double celling is necessary to accomplish this compelling purpose, and without a doubt it is

21  at this time, double celling itself is compelling.  Further, there is simply no other way to

22  house prisoners in light of the numbers of inmates outside of a general rule for double

23  celling.  Moreover, it does not take a trial to understand that single cell status in general

24  populations would be a most welcome benefit to most inmates.  If only one religious group

25  received this major benefit, resentments would flourish and/or there would be a rush by all

26  other religious groups to formulate a religious practice which required solitariness in

1   celling.[12]  Either way, such would wreak havoc in the prison system.  In short, RLUIPA

2   cannot be interpreted to make inherent prison characteristics unlawful.

3            Summary judgment should be granted on this claim.

4        E.  First Amendment

5            While inmates retain their First Amendment right to the free exercise of

6   religion, a regulation impinging on an inmate's constitutional rights passes muster so long

7   as it is reasonably related to a legitimate penological interest.  Henderson v. Terhune, 379

8   F.3d 709, 712 (9th Cir. 2004), citing O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S.

9   Ct. 2400 (1987) and Turner v. Safley, 482 U.S. 78, 89, 107 S. Ct. 2254 (1987).  The Turner

10   test includes four factors to determine if a prison regulation violates a prisoner's

11   constitutional rights.  "First, there must be a valid, rational connection between the prison

12   regulation and the legitimate governmental interest put forward to justify it, and the

13   governmental objective itself must be a legitimate and neutral one.  A second consideration

14   is whether alternative means of exercising the right on which the regulation impinges

15   remains open to prison inmates.  A third consideration is the impact accommodation of the

16   asserted right will have on guards, other inmates, and the allocation of prison resources.

17   Finally, the absence of ready alternatives is evidence of the reasonableness of a prison

18   regulation."  Allen v. Toombs, 827 F.2d 563, 567 (9th Cir. 1987) (citing Turner, 482 U.S. at

19   89-91); see also, Malik v. Brown III, 71 F.3d 724, 728-729 (9th Cir. 1995).

20            The Turner test is generally interpreted as less restrictive than RLUIPA on

21   the ability of prison officials to issue policies at odds with a professed religious belief.

22   Warsoldier v. Woodford, 418 F.3d 989, 997-998 (9th Cir. 2005).

23   \\\\\

24

25       [12]  Prisoners may understand the need for a certain inmate to be released early from work
     to attend a religious service, but they are not going to be understanding when they are deprived of
26   a major benefit on account of another's, or another's group, stated religious belief.

                                          24

1          1. *Participation in Jumu'ah Without Penalty*

2          For the same reasons as expressed for the RLUIPA claim, i.e., plaintiff does

3   not demonstrate in any fashion that he has been punished for attending Jumu'ah services,

4   defendants are entitled to summary judgment on this claim.

5          2. *Failure of SCC to Hire an Imam*

6          The undersigned previously found that plaintiff had access to a paid imam at

7   Pleasant Valley (except for the temporary absence of an imam at this time due to

8   resignation/transfer), and had no right to a paid imam at SCC.  This ruling does not change

9   under the First Amendment analysis.

10         3. *Beards and Long Hair*

11         The undersigned previously found that under RLUIPA, plaintiff's claim was

12  moot as far as prospective relief was concerned, and that RLUIPA did not allow a claim for

13  damages.  An action under the First Amendment would permit a claim for damages.[13]

14         Plaintiff's "injury" is his forced grooming under compulsion of the then

15  extant grooming regulations.  However, the Ninth Circuit's previous ruling in Henderson v.

16  Terhune, 379 F.3d 709, 715-16 (9th Cir.2004) (CDCR hair-length restriction does not

17  violate First Amendment) precludes plaintiff from proceeding further on this First

18  Amendment claim.

19         4. *Halal and Kosher Diets*

20         Under the RLUIPA claim, the undersigned found that issues of fact remained

21  concerning implementation of an [overdue] halal diet for Muslim prisoners, and whether for

22  the short interim, plaintiff could not be afforded a kosher diet.  Those same issues of fact

23  remain under a First Amendment Turner analysis.  Summary judgment should be denied on

24

25         [13] Even though plaintiff has not suffered physical injury, as required by the PLRA for
    emotional damages claims, the Ninth Circuit does not enforce this aspect of the PLRA for First
26  Amendment purposes.  Canell v. Lightner, 143 F.3d 1210, 1213 (9th Cir. 1998).

1    this claim.  All defendants should remain for this claim for purposes of injunctive relief and

2    First Amendment damages analysis.

3              5. *Prayer Oils*

4              As set forth above, a compelling need exists not to have improperly

5    sealed/documented flammable oil in prison cells.  At SCC, the Muslim inmates voluntarily

6    agreed to have their oil kept in the chapel; at Pleasant Valley, the oil is kept in the chapel

7    unless the Fire Marshal requirements are met for in-cell use.  Because plaintiff cannot make

8    out a RLUIPA claim, he will not be able to make a cognizable First Amendment claim.

9              6. *Single Cell Status*

10             Plaintiff's unreasonable claim for single cell status fares no better under the

11   First Amendment than it did for RLUIPA.  Summary judgment should be granted to

12   plaintiffs.

13       F. Qualified Immunity

14             For the five claims upon which the court has found summary judgment should

15   be granted, there is no need to analyze qualified immunity.  The law regarding the need to

16   modify diets for religious purposes has been well established for a number of years.  Indeed,

17   CVDR has recognized this in implementing a religious vegetarian diet and kosher diet.

18             However, the claim here is more nuanced.  Plaintiff was not simply told to eat

19   what was placed before him; he was told that he could have a religious vegetarian diet which

20   would not contradict his religious tenets.  There is no dispute in this case that the Muslim

21   religion does not *require* the eating of certain foods; it simply requires that some foods be

22   processed in a particular way, and pork products are off limit no matter how processed.  The

23   court finds that the nuanced claim qualifies for qualified immunity.  The claim here is

24   identical to that of Thompson v. Williams, 320 Fed. Appx. 678 (9th Cir. 2009) (finding that

25   reasonable prison officials would not have known that a substitute ovo-lacto diet would not

26   have met constitutional muster when these officials denied a halal/kosher diet.)  While not

26

1  precedent, the case is persuasive.  None of the defendants sued in their individual capacity

2  are liable for damages on the diet claim.

3  *CONCLUSION*

4         IT IS HEREBY ORDERED that plaintiff's motion to strike declarations

5  (Docket #140) is denied.

6         IT IS HEREBY RECOMMENDED that defendants' motion to dismiss and

7  for summary judgment (Docket # 117) should be denied insofar as administrative exhaustion

8  is concerned; it should be denied for Claim 4 (halal/kosher diet) as listed above on the merits

9  (both RLUIPA and First Amendment) for prospective relief purposes; the summary

10  judgment motion should be granted on the merits for Claims 1, 2, 3, 5 and 6 as listed above;

11  and defendants sued in their individual capacity have qualified immunity for Claim 4.

12         These findings and recommendations are submitted to the United States

13  District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).

14  Within twenty days after being served with these findings and recommendations, any party

15  may file written objections with the court and serve a copy on all parties.  Such a document

16  should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

17  Any reply to the objections shall be served and filed within ten days after service of the

18  objections.  The parties are advised that failure to file objections within the specified time

19  may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153

20  (9th Cir. 1991).

21  DATED: 08/25/09

                              /s/ Gregory G. Hollows
22                        _____
                              UNITED STATES MAGISTRATE JUDGE
23  GGH:gh:035
    pogu1873.fr

24

25

26

27